**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | |
|---|---|
| **Huiqun "Jenny" Lin Sun (a.k.a. Huiqun Zhang) and Texas Undercarriage Corp.,** | |
| *Plaintiffs/Counterclaim Defendants,* | **Case No. 6:25-cv-76** |
| **v.** | **Judge David S. Morales** |
| **Chunyi Zhao,** | **Magistrate Judge Jason B. Libby** |
| *Defendant/Counterclaim Plaintiff.* | |

**DEFENDANT/COUNTERCLAIM PLAINTIFF CHUNYI ZHAO'S ANSWER AND COUNTERCLAIMS AGAINST PLAINTIFFS/COUNTERCLAIM DEFENDANTS HUIQUN "JENNY" LIN SUN AND TEXAS UNDERCARRIAGE CORPORATION**

Defendant/Counterclaim Plaintiff, Chunyi Zhao ("Zhao" or "Defendant"), by and through undersigned counsel, files this ANSWER to Plaintiffs' Complaint (Dkt. 1), and asserts Counterclaims against Plaintiffs/Counterclaim Defendants, Huiqun "Jenny" Lin Sun a/k/a Huiqun Zhang ("Sun") and Texas Undercarriage Corporation ("TUC" or the "Company") (collectively, "Plaintiffs" or "Counterclaim Defendants"), and would respectfully show the Court as follows:

**ANSWER**

**I.    PRELIMINARY STATEMENT**

1.    Defendant denies the allegations contained in paragraph 1 of the Complaint.

2.    Defendant denies the allegations contained in paragraph 2 of the Complaint.

**II.    PARTIES**

3.    Defendant admits the allegations contained in paragraph 3 of the Complaint.

4.    Defendant admits the allegations contained in paragraph 4 of the Complaint

1

5.      Defendant admits that she is a citizen of the People's Republic of China and resides outside the United States.  Defendant otherwise lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 5 (including Plaintiffs' characterization of domicile which requires a legal conclusion under Australian law) and therefore denies the same.

## III.    JURISDICTION AND VENUE

6.      Defendant admits the allegations contained in Paragraph 6 of the Complaint.

7.      Defendant admits that this Court has personal jurisdiction over her.  However, Defendant denies that the 2024 stock purchase agreements are binding.  Defendant also denies the remaining allegations contained in paragraph 7 of the Complaint.

8.      Defendant admits that venue is proper in this District.  However, Defendant denies the remaining allegations contained in paragraph 8 of the Complaint, especially the allegation of the existence of any "resulting injury to Plaintiffs."

## IV.    ALLEGATIONS

### A.      Formation of Texas Undercarriage Corporation

9.      Defendant denies that she and/or her husband had any "significant history of shared business interests" with Sun and/or Sun's husband, as alleged in paragraph 9 of the Complaint.  Moreover, Defendant denies the remaining allegations contained in paragraph 9 of the Complaint.

2

10.     Defendant admits that TUC is a Texas corporation formed on or about September 21, 2022, as alleged in paragraph 10 of the Complaint.  However, Defendant denies the remaining allegations contained in paragraph 10 of the Complaint.

11.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of Plaintiffs' characterization of the referenced Bylaws and therefore denies the allegations contained in paragraph 11 of the Complaint.  Moreover, Defendant states that the referenced document speaks for itself.

12.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 12 of the Complaint, including the specific stock issuances and percentages alleged, and therefore denies the same.

**B.     2022 Class A Stock Purchase Agreement**

13.     Defendant admits that she signed a stock purchase agreement (the "2022 Class A SPA") dated November 1, 2022. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 13 of the Complaint and therefore denies the same.  Moreover, Defendant states that the referenced documents speak for themselves.

14.     Defendant admits that the 2022 Class A SPA specified a price and quantity of stock to be sold but did not specify a date when payment must be made. Defendant denies the remaining allegations contained in paragraph 14 of the Complaint.  Moreover, Defendant states that the referenced documents speak for themselves.

15.     Defendant admits the allegations contained in paragraph 15 of the Complaint.

16.     Defendant admits the allegations contained in paragraph 16 of the Complaint.

**C.      2024 Class A Stock Purchase Agreement**

17.     Defendant admits that she signed a stock purchase agreement (the "2024 Class A SPA") dated May 14, 2024.  However, Defendant denies the remaining allegations contained in paragraph 17 of the Complaint, specifically the allegation that, "[A]s a result of this transaction, Sun held 100-percent of TUC's Class A stock."  Moreover, Defendant states that the referenced documents speak for themselves.

18.     Defendant admits that the 2024 Class A SPA specified a price and quantity of stock to be sold but did not specify a date for payment. However, Defendant denies the remaining allegations contained in paragraph 14 of the Complaint.  Moreover, Defendant states that the referenced documents speak for themselves.

19.     Defendant admits that she did not make a formal demand for payment aside from the terms of the 2024 Class A SPA.  Moreover, Defendant denies the remaining allegations contained in paragraph 19 of the Complaint.

20.     Defendant admits that she noticed the wire transfer, referenced in paragraph 20 of the Complaint, on or about December 23, 2025.  However, Defendant denies the remaining allegations contained in paragraph 20 of the Complaint.

21.     Defendant admits that she never delivered the stock certificates, referenced in paragraph 21 of the Complaint, to Sun.  However, Defendant denies the remaining allegations contained in paragraph 21 of the Complaint.

4

**D.**   **2024 Class B Stock Purchase Agreement**

22.   Defendant admits she provided $350,000 to TUC in 2023.  However, Defendant otherwise lacks knowledge or information sufficient to admit or deny the remaining allegations contained in paragraph 22 of the Complaint and therefore denies the same.

23.   Defendant admits that the 2024 Class B Stock Purchase Agreement (the "2024 Class B SPA") did not specify a date for payment. Defendant also admits that she did not make a formal demand for payment aside from the terms of the 2024 Class B SPA.  However, Defendant denies the remaining allegations contained in paragraph 23 of the Complaint.

24.   Defendant admits that she was aware of the incoming wire transfer, referenced in paragraph 20 of the Complaint, on or about December 23, 2025, when Sun was trying to serve the Summons and Complaint. However, Defendant denies the remaining allegations contained in paragraph 24 of the Complaint.

25.   Defendant admits the dates, names of seller/buyer, price, number of shares, and the fact that Defendant made payment to Sun under the 2022 Class A SPA within 7 to 8 days after the execution of the 2022 Class A SPA.  Defendant denies that Sun properly and timely made payments under the 2024 Class A SPA and the 2024 Class B SPA.  However, Defendant denies the remaining allegations contained in paragraph 25 of the Complaint.

**E.    Zhao's Repudiation of the 2024 Class A SPA and 2024 Class B SPA**

26.    Defendant denies the allegations contained in paragraph 26 of the Complaint.

27.    Defendant denies the allegations contained in paragraph 27 of the Complaint. Sun did not have standing to request Zhang resign from his position with the Chinese manufacturing company.

28.    Defendant denies the allegations contained in paragraph 28 of the Complaint.

29.    Defendant admits that, on November 4, 2025, she demanded access to TUC's books and records and immediately terminated the 2024 Class A SPA and the 2024 Class B SPA for, among other things, Sun's failure to make payments.  However, Defendant denies the remaining allegations contained in paragraph 29 of the Complaint.

30.    Defendant states that the November 4, 2025, Demand Letter speaks for itself. However, Defendant denies the remaining allegations contained in paragraph 30 of the Complaint.

31.    Defendant states that the November 4, 2025, Demand Letter speaks for itself. However, Defendant denies the remaining allegations contained in paragraph 31 of the Complaint.

32.    Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 32 of the Complaint and therefore denies the same.

33.    Defendant denies the allegations contained in paragraph 33 of the Complaint.

**F.**        **Sun's Ownership of the Class A and Class B Shares**

34.        Paragraph 34 of the Complaint contains a legal conclusion to which no response is required.  To the extent that a response is required, Defendant denies the allegations contained in paragraph 34 of the Complaint.

35.        Defendant admits that, aside from their terms, the 2024 Class A SPA and the 2024 Class B SPA did not specify a date for payment. The remaining allegations contained in paragraph 35 of the Complaint state legal reasoning and legal conclusions to which no response is required.  To the extent that a response is required, Defendant denies the remaining allegations contained in paragraph 35 of the Complaint.

36.        Paragraph 36 of the Complaint contains a legal conclusion to which no response is required.  To the extent that a response is required, Defendant denies the allegations contained in paragraph 36 of the Complaint.

37.        Paragraph 37 of the Complaint contains a legal conclusion to which no response is required.  To the extent that a response is required, Defendant denies the allegations contained in paragraph 37 of the Complaint.

38.        Paragraph 38 of the Complaint contains a legal conclusion to which no response is required.  To the extent that a response is required, Defendant denies the allegations contained in paragraph 38 of the Complaint.

**G.**        **Removal of Zhao and Zhang from Director and Officer Roles**

39.        Defendant denies the allegations contained in paragraph 39 of the Complaint.

7

V.      **CAUSES OF ACTION**

40.      Defendant restates, as appropriate, the foregoing in response to the allegations contained in paragraph 40 of the Complaint.

**Count 1: Declaratory Judgment (Class A Shares)**

41.      Paragraph 41 of the Complaint contains a statement to which no response is required.  To the extent that a response is required, Defendant denies the allegations contained in paragraph 41 of the Complaint.

42.      Paragraph 42 of the Complaint contains a statement to which no response is required.  To the extent that a response is required, Defendant denies the allegations contained in paragraph 42 of the Complaint.

43.      Paragraph 43 of the Complaint contains a statement to which no response is required.  To the extent that a response is required, Defendant denies the allegations contained in paragraph 41 of the Complaint.

**Count 2: Declaratory Judgment (Class B Shares)**

44.      Paragraph 44 of the Complaint contains a statement to which no response is required.  To the extent that a response is required, Defendant denies the allegations contained in paragraph 44 of the Complaint.

45.      Paragraph 45 of the Complaint contains a statement to which no response is required.  To the extent that a response is required, Defendant denies the allegations contained in paragraph 45 of the Complaint.

46. Paragraph 46 of the Complaint contains a statement to which no response is required. To the extent that a response is required, Defendant denies the allegations contained in paragraph 46 of the Complaint.

**Count 3: Breach of Contract (2024 Class A SPA)**

47. Paragraph 47 of the Complaint contains a statement to which no response is required. To the extent that a response is required, Defendant denies the allegations contained in paragraph 47 of the Complaint.

48. Paragraph 48 of the Complaint contains a statement to which no response is required. To the extent that a response is required, Defendant denies the allegations contained in paragraph 48 of the Complaint.

49. Paragraph 49 of the Complaint contains a statement to which no response is required. To the extent that a response is required, Defendant denies the allegations contained in paragraph 49 of the Complaint.

50. Paragraph 50 of the Complaint contains a statement to which no response is required. To the extent that a response is required, Defendant denies the allegations contained in paragraph 50 of the Complaint.

51. Paragraph 51 of the Complaint contains a statement to which no response is required. To the extent that a response is required, Defendant denies the allegations contained in paragraph 51 of the Complaint.

## VI.    ATTORNEYS' FEES

52.    Paragraph 52 of the Complaint contains a statement to which no response is required.  To the extent that a response is required, Defendant denies the allegations contained in paragraph 52 of the Complaint.

53.    Paragraph 53 of the Complaint contains a statement to which no response is required.  To the extent that a response is required, Defendant denies the allegations contained in paragraph 53 of the Complaint.

54.    Paragraph 54 of the Complaint contains a statement to which no response is required.  To the extent that a response is required, Defendant denies the allegations contained in paragraph 54 of the Complaint.

## VII.    JURY DEMAND

55.    Defendant admits that Plaintiffs and Defendant demand a trial by jury on all issues so triable.  However, Defendant denies the remaining allegations contained in paragraph 55 of the Complaint.

## VIII.    PRAYER

56.    Paragraph 56 of the Complaint contains statements to which no response is required.  To the extent that a response is required, Defendant denies the allegations contained in all subparts to paragraph 56 of the Complaint.

### IX.    <u>MISCELLANEOUS</u>

57.    Defendant denies each and every allegation contained in the Complaint not expressly admitted herein to be true.

58.    Defendant's responses to the allegations contained in the Complaint are based on information presently available to Defendant.  Defendant reserves the right to amend or supplement this Answer as discovery proceeds.

59.    To the extent the Complaint contains legal conclusions, characterizations of documents, or requests for the Court to draw inferences, no response is required.  To the extent that a response is required, Defendant denies the allegations contained the Complaint.

### <u>AFFIRMATIVE DEFENSES</u>

Without assuming any burden of proof that would otherwise rest with Plaintiffs, Defendant asserts the following affirmative defenses and reserves the right to assert additional affirmative defenses as discovery proceeds:

1.    Failure to State a Claim.  Plaintiffs fail to state one or more claims upon which relief can be granted.

2.    Prior Material Breach / Failure of Consideration.  Plaintiffs' claims are barred, in whole or in part, by Plaintiffs' own prior material breach and/or failure of consideration.

11

3.      Failure of Conditions Precedent / Corporate Formalities.  Plaintiffs' requested ownership and governance relief is barred to the extent Plaintiffs failed to satisfy conditions precedent and/or required corporate formalities under the governing corporate documents and applicable law, including requirements relating to share-transfer mechanics and corporate records.

4.      No Entitlement to Equitable Relief.  Plaintiffs are not entitled to declaratory relief, specific performance, or injunctive relief, because they have an adequate remedy at law, cannot establish irreparable harm, and cannot satisfy the requirements of Fed. R. Civ. P. 65.

5.      Unclean Hands / Inequitable Conduct.  Plaintiffs' equitable claims are barred, in whole or in part, by unclean hands and inequitable conduct.

6.      Waiver / Estoppel / Laches.  Plaintiffs' claims are barred, in whole or in part, by waiver, estoppel, and/or laches.

7.      Attorneys' Fees Not Recoverable.  Plaintiffs are not entitled to attorneys' fees, except to the extent expressly permitted by statute and proven.

8.      TUC's Capacity/Authorization and Improper Alignment as Plaintiff.  Upon information and belief, TUC's participation as a plaintiff in this internal ownership and control dispute is not the product of duly authorized corporate action by disinterested corporate decision-makers and is instead directed by one faction (i.e., Sun) adverse to another shareholder and other directors (Zhao and Zhang). TUC therefore lacks capacity and/or proper authorization to prosecute the claims asserted in the Complaint, and/or TUC is improperly aligned as a plaintiff and should be treated as a nominal party pending adjudication of the rightful ownership and

12

governance of the Company. Defendant reserves the right to seek appropriate relief, including dismissal of TUC's claims, realignment, and/or other relief as the Court deems just.

9.      Failure to Join Party.  Plaintiffs have failed to join a party under Civil Rule 19.

10.      Failure of Consideration.  There is a failure of consideration in this matter.

11.      Fraud.  Plaintiffs' claims fail, in whole or in part, due to fraud and/or misrepresentation.

12.      Illegality.  Plaintiffs' claims fail, in whole or in part, due to illegality.

## COUNTERCLAIMS

Defendant/Counterclaim Plaintiff, Chunyi Zhao ("Zhao"), by and through her undersigned counsel, asserts the following Counterclaims against Plaintiffs/Counterclaim Defendants, Huiqun "Jenny" Lin Sun a/k/a Huiqun Zhang ("Sun") and Texas Undercarriage Corporation ("TUC" or the "Company") (collectively, "Counterclaim Defendants"). These counterclaims arise out of the same transactions and occurrences that are the subject of Counterclaim Defendants' Complaint and are asserted under Fed. R. Civ. P. 13.

In sum, Zhao seeks declaratory and injunctive relief to stop Sun's ongoing attempted corporate coup by paper; to prevent dissipation of corporate funds to finance this litigation and/or competing ventures; and to restore lawful corporate governance pending adjudication of the parties' true ownership rights.

## I.    NATURE OF COUNTERCLAIMS

1.    Sun's Complaint attempts to convert late, post-termination tenders of money into a retroactive "closing" of two purported stock purchase agreements (the "2024 Class A SPA" and the "2024 Class B SPA"), while simultaneously ignoring the Company's Bylaws, which require that stock transfers be made—at least as to certificated shares—upon surrender and cancellation of certificates. (Bylaws § 7.2 provides: "Transfer of Shares. Transfer of shares of the corporation shall be made only on the stock transfer books of the corporation by the holder of record thereof or by his/her legal representative who shall furnish proper evidence of authority to transfer, or by his/her attorney thereunto authorized by power of attorney duly executed and filed with the secretary of the corporation, *and on surrender* for cancellation of the certificate for such shares. The person in whose name shares stand on the books of the corporation shall be deemed by the corporation to be the owner thereof for all purposes.")  See Dkt. 1-2 at 19 (emphasis added).

2.    Sun's core theory—that ownership "vested" on May 14, 2024, despite lack  of payment, lack of delivery, lack of compliance with the Bylaws, and termination of the SPAs— invites this Court to bless an outcome that is commercially unreasonable, contrary to the parties' course of dealing, and inconsistent with the Company's governing documents.

3.    Sun then attempted to leverage that manufactured "sole owner" narrative to cause TUC's counsel to issue notices on December 22, 2025, purporting to remove Zhao and her husband, Wenbin Zhang, from  board and officer roles, and revoke banking access, despite the fact that Zhao remains a shareholder of record and the Company's records do not reflect the transfer Sun now claims.

14

4.    Indeed, to underscore good faith and avoid any false claim of "acceptance" or "waiver," Zhao has not accepted the post-termination tenders as closing payments. Instead, in early January 2026, Zhao caused all post-termination payments, purporting to satisfy the purchase prices stated in the 2024 Class A SPA and the 2024 Class B SPA, to be placed into the trust/IOLTA account of her then counsel Archer & Greiner, P.C.[1], pending Court order or a written agreement of the parties regarding disposition.

## II.    PARTIES

5.    Zhao is a citizen of the People's Republic of China and resides in Australia.

6.    Sun is a citizen of the United States of America and resides in Victoria, Texas.

7.    TUC is a Texas corporation with its principal office in Victoria County, Texas.

## III.    JURISDICTION AND VENUE

8.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 for the reasons alleged in the Complaint. These counterclaims form part of the same case or controversy.

9.    Venue is proper in this District for the reasons alleged in the Complaint.

## IV.    FACTUAL ALLEGATIONS

### A.    Decades-long personal relationship; and formation of the Texas joint venture.

10.    Sun and her husband, Tao Lin ("Lin"), have had a decades-long personal relationship with Zhao and her husband, Wenbin Zhang ("Zhang").

---

[1] Archer & Greiner, P.C. has transferred the funds to FisherBroyles, LLP, Zhao's current counsel.

11.    In or about early September 2022, Sun's husband, Lin, approached Zhao's husband, Zhang, and proposed that the two families work together to set up a joint venture in Texas to manufacture and sell machinery products in the United States.

12.    In reasonable (and detrimental) reliance upon the representations of Sun and Lin regarding mutual trust, joint operation, and fair dealing, Zhao agreed to form a joint venture in Texas to manufacture and sell certain machinery products in the U.S. market.

13.    As Plaintiffs admit, on September 21, 2022, Sun, Zhao, and Zhang formed TUC. (Complaint ¶ 10.)  The Company's Board of Directors included Zhao, Zhang, and Sun.

14.    As Plaintiffs admit, TUC's Bylaws authorize Class A voting shares and Class B non-voting shares. (Complaint ¶ 11; see also Bylaws.)

15.    As Plaintiffs admit, TUC initially issued 1,000 Class A shares, with Sun receiving 800 and Zhao receiving 200. (Complaint ¶ 12.)  The stock certificates were issued on September 21, 2022.

16.    And, as Plaintiffs admit, on November 1, 2022, Sun and Zhao executed a stock purchase agreement (the "2022 Class A SPA") by which Sun sold 310 Class A shares to Zhao, resulting in Zhao holding 510 Class A shares and Sun holding 490 Class A shares.  In other words, Zhao is majority voting shareholder (51%) and Sun is minority voting shareholder (49%). (Complaint ¶¶ 13–15.)

17.    Zhao, through Zhang, paid the purchase price ($6,851) on November 8-9, 2022. The stock certificate was issued on November 1, 2022. (Complaint ¶ 16)

16

18.    In or about January 2023, at TUC's request, Zhao contributed $350,000 to enable TUC to purchase land in Victoria, Texas for the development of a manufacturing facility.

19.    On or about November 11, 2024, Zhao and Zhang caused Xuzhou Laiyi Precision Machinery Co., Ltd. ("XLP"), a Chinese manufacturer that they own and operate, to wire transfer $4,000,000 to TUC to fund its operations, in reasonable reliance on representations by Lin and Sun that the funds would be used to construct a manufacturing facility on TUC's property in Victoria, Texas.

20.    On or about May 21, 2025, Lin and Sun caused the formation of United Track Corporation ("UTC"), a Texas corporation wholly owned by TUC and placed under the exclusive control of Lin and Sun as its directors.

21.    Upon information and belief, Sun and Lin, acting through UTC, diverted and misappropriated no less than $500,000 of funds provided by XLP and Zhao to establish and finance United Machinery (Xuzhou) Co., Ltd. ("UM") and Xuzhou Baohongyuan Intelligent Machinery (Xuzhou) Co., Ltd. ("XBIM") in Xuzhou, China, in a bad-faith effort to compete directly with XLP.

**B.    <u>The 2024 SPAs were never consummated as transfers under the Bylaws; and payment was not made within a reasonable time and was tendered only after Zhao terminated the SPAs for nonpayment</u>**

22.    On or about May 14, 2024, Sun and Zhao signed instruments captioned as the 2024 Class A SPA (purportedly for 510 Class A shares) and the 2024 Class B SPA (purportedly for 35 Class B shares) (collectively, the "2024 SPAs").

17

23.     Regardless of titles, the parties failed to consummate a completed transfer of ownership under the Company's governance documents. Under TUC's Bylaws, among other things:

- Certificates are to be issued for shares.

- Transfer of shares is to be made only upon surrender for cancellation of the certificate. (Bylaws art. VII.) See Dkt. 1-2 at19

24.     Sun failed to pay the stated purchase prices for the 2024 Class A SPA ($11,271) and the 2024 Class B SPA ($350,000) for more than 18 months (tendered on November 18, 2025 and December 17, 2025,  respectively),  only after Zhao's counsel issued written SPA termination notices on or about November 4–5, 2025).

25.     A buyer's obligation to pay the purchase price is not a minor technicality; it is the core exchange.  Sun's failure to pay the purchase prices were  material breaches and, at minimum, failures to perform within a reasonable time as a matter of law and commercial practice.

26.     On or about November 4–5, 2025, Zhao, through counsel, provided written notices to Sun terminating the 2024 SPAs due to Sun's nonpayment and other misconduct.

27.     Only after termination, Sun and Lin (on Sun's behalf) transmitted funds purporting to be "payment" under the 2024 SPAs. (Complaint ¶¶ 20, 24) See Dkts. 1-7 at 2, 1-11 at 2.

28.     Zhao did not accept those post-termination tenders as a belated closing of the deals. Instead, on January 12, 2026, Zhao caused all such post-termination tendered funds to be placed into her lawyer's trust/IOLTA account, where the funds remain pending Court order or written agreement of the parties. See Ex. 1.

18

**C.      Sun's "sole owner" narrative was used to engineer a paper takeover and to weaponize TUC's funds and records.**

29.     Sun and TUC—fraudulently controlled by Sun—have taken the position that Sun is the sole owner of all Class A and Class B shares and that Zhao has no shareholder rights.

30.     Indeed, on December 22, 2025, counsel purporting to represent TUC sent Zhao (and separately Zhang) a letter stating that, "effective immediately," Zhao and Zhang were removed from all company positions, had no authority to act for TUC, and were required to return corporate property, records, and devices by January 5, 2026.

31.     These notices were premised on Sun's claim of sole voting ownership—an assumption Zhao disputes and which is the central issue in this litigation.

32.     Upon information and belief, Sun and Lin have engaged in intentional self- dealing, corporate waste, and knowing misappropriation of TUC's corporate funds, including but not limited to the following acts:

a.     On or about December 18, 2025, Sun and Lin caused TUC to disburse $350,000 as a purported "payment" for Class B shares—for Sun's own personal benefit, without any corporate authorization, without approval from a disinterested board, and in direct violation of Sun's fiduciary duties. This transaction constitutes **an ultra vires diversion of corporate funds** to finance Sun's personal equity claims adverse to TUC and its majority shareholder.

b.     On or about December 21, 2025, Sun and Lin improperly used TUC funds to hire and pay litigation counsel to initiate and prosecute this lawsuit against Zhao, who at all relevant times was TUC's majority shareholder and a sitting director. This expenditure served no legitimate corporate purpose, was undertaken solely to advance Sun's personal control dispute,

and constitutes corporate waste and knowing misuse of corporate assets in furtherance of Sun's individual interests.

c.     In late December 2025, Sun and Lin caused TUC—acting through UTC—to wire approximately $500,000 out of the United States to China to fund the business operations of UM and XBIM. These Chinese entities were formed and controlled by Sun and/or Lin and compete directly with Zhao's company, XLP. This diversion of funds represents self-dealing, misappropriation, and knowing dissipation of TUC assets to support foreign competitors at the expense of TUC's own business and strategic interests.

33.     There is a serious and immediate risk that, while ownership is disputed, Sun will continue to use TUC's:

- cash and credit,

 - accounting system and corporate records,

- vendor and customer relationships, and

 - business operations

to (a) finance this litigation, (b) consolidate unilateral control, and/or (c) engage in activity adverse to Zhao's and TUC's interests, including, but not limited to, competing activity using shared know-how and relationships developed through the parties' joint venture.

34.     Without court-ordered preservation and intervention, Zhao's governance and property rights—and the integrity of the Company's books and funds—will be irreparably harmed before final judgment.

## V.    COUNTER-ARGUMENTS (INCORPORATED INTO COUNTS BELOW)

### A.    Sun's claim of "no material breach" fails.

35.    Even when a contract is silent as to a payment deadline, Texas law implies that, when a contract does not specify a time for performance—including payment—the law requires performance within a **reasonable time**. *Stovall v. Texas Co.,* 253 S.W. 1106 (Tex. Civ. App.—Galveston 1923, no writ); *Moore v. Dilworth,* 142 Tex. 538, 179 S.W.2d 940, 942 (1944). What is reasonable depends on the nature of the transaction and surrounding circumstances. *Hart v. Bullion*, 48 Tex. at 289 (1877).  And where the material facts are undisputed, Texas courts may decide reasonableness as a matter of law.  Here, waiting roughly **18 months** to purportedly tender payment of the purchase price—particularly in a transaction alleged to shift corporate control—does not constitute performance within a reasonable time.

36.    Sun's "reasonable time" theory is belied by the parties' own course of dealing. Texas law looks to the parties' prior performance and course of dealing to supply missing terms and to determine what constitutes a "reasonable time" for performance when an agreement is silent. *Tex. Bus. & Com. Code § 1.303(d), (f)* (course of performance and course of dealing are relevant to ascertain the meaning of the agreement and may "supplement or qualify" its terms). Here,  Sun affirmatively admitted  that the parties previously executed a "barebones" stock purchase agreement that, like the 2024 SPAs, **specified price and quantity but contained no deadline for payment**, yet payment was nonetheless made promptly—**within seven to eight days**. (Compl. ¶¶ 13–16 (Sun alleges the 2022 Class A SPA was executed November 1, 2022; and that Zhao, through her husband, paid the full purchase price of $6,851.00 on November 8 and/or November 9, 2022).)

37.     That pleaded history and admission is powerful evidence of the parties' shared expectation that payment would follow within days—not **eighteen months**—and defeats Sun's attempt to re-write "reasonable time" to mean unlimited forbearance. In other words, the only concrete benchmark the pleadings provide for a silent-payment SPA between these parties is a **one-week payment cadence**, making Sun's prolonged nonpayment a material deviation from the parties' established course of dealing and performance.

38.     Sun's failure to pay timely deprived Zhao of the bargain and prevented any commercially meaningful closing. In other words, Sun's breach was material.

39.     A post-termination tender does not retroactively erase a material breach or negate a termination already invoked, particularly where the seller does not accept the tender and instead places it in a trust account pending adjudication of this action.

**B.     Sun's claim that ownership "vested" on signing is contrary to the Company's Bylaws and the reality of how share transfers occur.**

40.     Sun's "vesting upon execution" theory ignores the fact that TUC's Bylaws govern how shares are issued and transferred, including certificate surrender/cancellation for certificated shares.

41.     Article 2 of the 2024 Class A SPA is dispositive, because it subordinates the purported sale to TUC's governing documents, and Bylaws §§ 7.1–.2 expressly provide that no transfer of certificated shares is effective absent certificate surrender for cancellation, thereby foreclosing any claim of ownership based solely on contract execution. See Dok. 1-2 at 19 Bylaws: Article VII. CERTIFICATES FOR SHARES AND THEIR TRANSFER; Dkt. 1-5 at 2.

42.     Indeed, Texas law strictly enforces corporate governance documents governing share transfers. When bylaws require specific transfer mechanics — including certificate

22

surrender— Texas courts hold that no ownership transfer occurs absent compliance with those mandatory conditions. See, *Stephens v. Three Finger Black Shale P'ship,* 580 S.W.3d 687, 694–95 (Tex. App.—Eastland 2019, pet. denied) (enforcing governing-document restrictions affecting ownership rights).

43.    Here, TUC's Bylaws expressly condition any valid transfer of certificated shares on both certificate surrender for cancellation and entry on the Company's stock-transfer books. Those provisions are mandatory, not aspirational. Because Plaintiffs do not (and cannot) allege compliance with either prerequisite, their "vesting upon execution" theory fails as a matter of Texas law.

44.    Sun's attempt to claim ownership of the Class A and Class B shares without proof of proper transfer under the Bylaws and corporate records should be rejected.

45.    Moreover, between May 14, 2024, and December 22, 2025, Sun's actions and communications demonstrate that the 2024 SPAs were never consummated.

46.    On or about December 19, 2024, Sun's husband, Lin, emailed Zhao and Zhang to propose that TUC acquire a second parcel of land in Texas. See Ex. 2.

47.    On or about January 22, 2025, Sun sent an email attaching a draft Consent of Directors acknowledging Zhao, Zhang, and Sun as the sole directors of TUC, and seeking Zhao's and Zhang's approval for TUC to purchase a parcel of land in Texas. See Ex. 3.

48.    These communications are inconsistent with Sun's present claim that she had already become TUC's sole owner by virtue of the 2024 SPAs. Instead, they reflect that Sun continued to recognize Zhao's governance rights and ongoing role in TUC's corporate affairs well after May 14, 2024.

## VI.    COUNTERCLAIMS

### COUNT I — Declaratory Judgment (28 U.S.C. §§ 2201–2202)

**(Against Counterclaim Defendants regarding ownership of TUC shares; invalidity of purported rescission-by-buyer / invalidity of Sun's claimed sole ownership; and invalidity of removal actions premised on that claim.)**

49.    Zhao incorporates ¶¶ 1–48 as if fully rewritten herein.

50.    Actual controversies exist regarding:

a.    whether Sun materially breached the 2024 SPAs by failing to tender the purchase prices within a reasonable time;

b.    whether Zhao lawfully terminated the 2024 SPAs for nonpayment;

c.    whether any transfer of Class A and/or Class B shares was consummated consistent with the Bylaws and Texas law;

d.    whether Sun is the sole owner of TUC; and

e.    whether Sun's actions taken as purported "sole shareholder," including purported removal of directors/officers and control of accounts/records, are valid.

51.    Zhao seeks declarations that:

a.    Sun materially breached the 2024 SPAs by nonpayment and failure to perform within a reasonable time;

b.    Zhao's termination of the 2024 SPAs was effective;

24

c.    Sun did not acquire ownership and/or voting control of the disputed Class A shares and did not acquire ownership of the disputed Class B shares through an unconsummated, non-paid, and non-compliant "transaction;"

d.    Zhao remains a 51% Class A shareholder of record with corresponding voting rights unless and until a lawful transfer occurs; and

e.    actions taken based on Sun's fraudulent "sole owner" premise—including purported corporate removals and unilateral control measures—are void and/or voidable and should be enjoined pending final judgment.

52.    A real, substantial, and justiciable controversy exists between the parties concerning the validity, effect, and termination of the 2024 SPAs, the ownership of the disputed Class A and Class B shares, and the legitimacy of Sun's purported exercise of corporate authority based on her claimed "sole shareholder" status. The controversy is concrete, adverse, and based on conduct that has already occurred, not hypothetical or contingent.

53.    The dispute involves the parties' real and legally protectable interests, including Zhao's asserted ownership rights, governance rights, and ability to participate in corporate decision-making, as well as Sun's competing claims to exclusive ownership and unilateral authority over TUC. The interests at stake directly affect the control, operation, and management of the Company, making the controversy immediate and substantial.

54.    The issues presented are appropriate for resolution under the federal Declaratory Judgment Act, as they concern the interpretation and enforcement of written agreements, compliance with corporate governance documents, the validity of alleged share transfers, and the

25

legality of actions taken under disputed ownership claims. These are classic subjects for declaratory relief and fall squarely within the Court's jurisdiction to resolve disputes involving contract rights and corporate governance.

55.     The relief sought does not require the Court to issue an advisory opinion.  Zhao seeks declarations resolving existing and ongoing disputes arising from past acts—namely, Sun's nonpayment, Zhao's termination of the 2024 SPAs, Sun's subsequent assertion of sole- owner status, and Sun's related actions premised on that status. Declaratory relief is necessary to clarify the parties' rights and to prevent further harm during the pendency of this litigation.

**COUNT II — Breach of Contract (Texas law)**

**(Against Sun for breach of the 2024 SPAs / nonpayment within reasonable time.)**

56.     Zhao incorporates ¶¶ 1–55 as if fully rewritten herein.

57.     Sun and Zhao entered into the 2024 SPAs.

58.     The 2024 SPAs required Sun to pay the stated purchase prices as the essential consideration for any purchase and sale.

59.     Sun breached the 2024 SPAs by failing to pay the purchase prices within a reasonable time, constituting a material breach.

60.     Sun provided no consideration for the 2024 SPAs.

61.     Because of Sun's above-referenced breaches, Zhao provided written notice of termination of the 2024 SPAs.

62.     Sun's post-termination tenders did not cure the breach and were not accepted; the funds were placed into counsel's trust account pending adjudication.

26

63.　　Zhao has been damaged by Sun's breach of the 2024 SPAs, including, but not limited to, the following: loss of the bargain, costs, attorneys' fees recoverable under Tex. Civ. Prac. & Rem. Code § 38.001 (to the extent applicable to the contract claim), and other relief permitted by law.

## COUNT III — Rescission / Failure of Consideration / Restitution (Texas equitable relief)

### (Alternative pleading against Sun.)

64.　　Zhao incorporates ¶¶ 1–63 as if fully rewritten herein.

65.　　Alternatively, to the extent the Court finds the 2024 SPAs formed enforceable executory contracts, Sun's prolonged nonpayment constitutes a failure of consideration and/or material breach entitling Zhao to rescission and restoration of the *status quo ante.*

66.　　Zhao seeks an order confirming rescission and directing disposition of the disputed funds currently held in the trust account of Zhao's lawyer, while confirming Zhao's ownership rights in the disputed shares.

67.　　Rescission is an equitable remedy available under Texas law when a material failure of consideration defeats the central purpose of the agreement. Here, Sun's prolonged nonpayment—spanning approximately 18 months—constitutes a complete failure of the essential consideration underlying the 2024 SPAs. Without timely payment of the agreed purchase prices, no valid exchange occurred, and the agreements lack the mutual performance required to sustain an enforceable transfer of ownership.

68.　　Texas courts recognize that rescission is appropriate where the effect of the breach is so substantial that it renders performance by the non-breaching party useless or fundamentally different from what was agreed. Sun's nonpayment left Zhao without the benefit of her bargain,

27

prevented any meaningful closing from occurring, and frustrated the very purpose of a stock-purchase agreement. The equities therefore support restoring the parties to the positions they occupied before execution of the 2024 SPAs.

69.     Equity further favors rescission, because Zhao did not, through action or inaction, waive her right to terminate or acquiesce in Sun's breach. Upon learning that Sun did not intend to make timely payment, Zhao issued formal notices of termination in early November 2025 and made clear that she would not accept any late tender as satisfaction of the contracts. Zhao acted promptly, decisively, and consistently with her rights as the non-breaching party.

70.     Moreover, Zhao took affirmative steps to restore the parties to the status quo ante by safeguarding the post-termination tendered funds. Rather than treating the belated transfers as payment or as a de facto closing, Zhao caused all such funds to be placed in her counsel's trust/IOLTA account pending Court order or written agreement of the parties. This constitutes a proper restoration—or offer to restore—consideration, satisfying the equitable requirement that a party seeking rescission not retain benefits arising from the disputed agreements.

71.     Rescission is also warranted, because any alternative remedy would be inadequate under the circumstances. The nature of the dispute—control of a closely held corporation, ownership of voting shares, and competing claims to governance authority—cannot be fully remedied by monetary damages alone. Only rescission can unwind the defective, unconsummated agreements and prevent Sun from leveraging late tender as a retroactive means of seizing ownership and governance rights.

72.     Finally, rescission serves the interests of equity and fairness by preventing Sun from benefiting from her own prolonged nonperformance. Allowing Sun to obtain control of

28

Class A and Class B shares despite material nonpayment, termination, and noncompliance with corporate formalities would sanction inequitable conduct and upend the parties' expectations. Equity does not permit such an outcome, and rescission is necessary to prevent unjust enrichment and restore proper corporate governance pending final adjudication.

**COUNT IV — Breach of Fiduciary Duty (Direct) (Texas law)**

**(Against Sun for misuse of corporate control mechanisms, records, and funds while ownership is disputed.)**

73.    Zhao incorporates ¶¶ 1–72 as if fully rewritten herein.

74.    Sun has served as an officer/director of TUC (including Secretary, as Plaintiffs allege elsewhere) and, in that capacity, owes fiduciary duties of loyalty, good faith, fair dealing, and candor in connection with corporate governance and handling of corporate property.

75.    Sun breached those fiduciary duties by, among other actions:

a.    asserting sole ownership and governance control without lawful transfer and without compliance with the Bylaws;

b.    causing corporate counsel to issue removal and "no authority" notices to Zhao and Zhang based on that false premise;

c.    using (or attempting to use) TUC funds, records, and vendor/customer relationships to entrench Sun's position and prosecute this litigation; and

d.    refusing to maintain transparent, neutral preservation of corporate books and bank records while the ownership dispute is pending.

29

76.     Zhao has been damaged and faces irreparable injury, absent injunctive relief preserving governance and corporate assets. Without interim protection, Sun's continued assertion of unilateral control threatens to further impair Zhao's voting rights, diminish the value of her ownership interest, and allow dissipation or diversion of corporate funds in ways that cannot be remedied by monetary damages alone. In addition, the ongoing misuse or withholding of corporate records, financial accounts, and managerial authority poses a substantial risk of permanent loss of corporate information, erosion of business relationships, and further entrenchment of Sun's improper control, all of which constitute irreparable harm requiring the Court's immediate intervention.

## COUNT V — Shareholder Inspection / Accounting / Books-and-Records Relief
**(Against Counterclaim Defendants.)**

77.     Zhao incorporates ¶¶ 1–76 as if fully rewritten herein.

78.     As a shareholder of record and/or beneficial owner of TUC shares (and, at minimum, as the person Sun claims sold shares but never received timely payment), Zhao is entitled to inspect and obtain TUC's books and records to evaluate the Company's finances and protect her ownership rights, including under TUC's Bylaws and applicable Texas law.

79.     Counterclaim Defendants have denied or impaired meaningful access, while simultaneously attempting to seize Zhao's access to records and systems.

80.     Zhao seeks an order compelling production and ongoing access to TUC's:

- bank statements and transaction histories for all accounts;

- general ledger, QuickBooks (or equivalent), and supporting documents;

- accounts payable/receivable;

- payroll and contractor payments;

- tax filings;

- corporate minutes/consents and stock ledger/transfer books; and

- communications with banks and payment platforms regarding authority changes.

81.    Zhao has standing to seek inspection and accounting- related relief, because she remains, at minimum, a shareholder of record and/or beneficial owner of TUC shares under Texas law and the Company's governing documents. Even if Sun disputes Zhao's continued ownership—a dispute Zhao vigorously challenges—the existence of that dispute does not defeat Zhao's standing to seek inspection.  Indeed, Texas courts hold that inspection rights are especially important where ownership or governance rights are under challenge.

82.    In addition, Zhao made written demands for access to TUC's books and records, including through the November 4, 2025, demand issued through counsel, which expressly sought financial records, governance materials, banking authorities, and other documents necessary to evaluate the Company's condition. These written demands satisfy any requirement under Texas law or under TUC's Bylaws that a shareholder first request access before invoking judicial relief.

83.    Zhao's purposes for inspecting TUC's books and records are proper and authorized under Texas law, including evaluating the financial condition of the Company, investigating potential mismanagement and misuse of corporate assets, confirming the accuracy of corporate records, assessing the validity of Sun's claimed authority over corporate affairs, and

31

protecting her ownership and governance rights. These purposes are not only proper—they are especially compelling given the ongoing ownership dispute and Sun's efforts to assert unilateral control.

84.     Zhao has further identified with reasonable specificity the categories of documents she seeks, including TUC's bank statements, financial transaction histories, general ledger, QuickBooks or accounting files, accounts receivable and payable, payroll and contractor payments, tax filings, stock ledger and transfer books, corporate minutes and consents, and communications with banks regarding authorization changes. Each category is narrowly tailored to the proper purposes identified above and directly relates to the management, financial affairs, and governance of the Company.

85.     The scope of Zhao's requested inspection is also consistent with limitations recognized under Texas law. Zhao seeks only documents reasonably related to her proper purposes and does not request confidential personal records, privileged litigation materials, or documents unrelated to the Company's governance and financial affairs. To the extent any limitation applies, Zhao seeks inspection only to the full extent permitted by statute, the Bylaws, and equitable principles governing closely held corporations.

86.     Because Counterclaim Defendants have refused to provide full and meaningful access to the records requested, and because the records are necessary to protect Zhao's rights and to prevent further harm during this dispute, judicial intervention is warranted. Without Court-ordered inspection and accounting relief, Zhao cannot verify the accuracy of TUC's financial information, assess the propriety of Sun's expenditures, or prevent the dissipation or misuse of Company assets.

## COUNT VI — Derivative Claims on Behalf of TUC (Fed. R. Civ. P. 23.1)

**(Against Sun on behalf of TUC for breach of fiduciary duty / corporate waste / ultra vires expenditures.)**

87.    Zhao incorporates ¶¶ 1–86 as if fully rewritten herein.

88.    Zhao brings this count derivatively on behalf of TUC against Sun to redress harm to the Company from self-interested or unauthorized conduct, including corporate waste and use of corporate assets to fund a shareholder control dispute for personal benefit.

89.    Zhao will verify these derivative allegations as required by Rule 23.1.

90.    Demand on the board to commence this action is futile, because Sun has asserted exclusive control, has caused counsel to act under Sun's direction, and there is no disinterested decision-maker presently able to evaluate and pursue claims against Sun.

91.    Sun's conduct has caused and threatens to cause injury to TUC, including, but not limited to, dissipation of corporate funds, disruption of operations, and reputational/relationship harm.

92.    Zhao seeks relief for TUC, including, but not limited to, restitution, an accounting, and injunctive limitations on ultra vires spending and related-party transactions.

93.    Zhao has standing to assert derivative claims on behalf of TUC, because she was a shareholder of the Company at the time of the improper transactions and conduct, and continues to possess a direct and substantial interest in the proper management and protection of the Company. Zhao also brings these claims in her capacity as a shareholder of record and/or

beneficial owner, which satisfies the standing requirements under Rule 23.1 and Texas law governing derivative actions.

94.     Zhao will fairly and adequately represent the interests of the shareholders similarly situated to her, and her interests are fully aligned with the Company's interest in halting further misuse of corporate funds, preventing ultra vires expenditures, and restoring lawful governance. Zhao has no disabling conflict of interest, no divergent personal agenda, and no antagonism to other shareholders.  Rather,  she seeks relief solely to protect TUC from continued harm arising from Sun's unauthorized conduct.

95.     The pleading requirements of Rule 23.1 are satisfied, because this derivative count is verified and states with particularity the factual basis for Zhao's allegations, the wrongful acts, the injuries resulting to TUC, the lack of disinterested decision-makers, and the reasons why demand is futile. Zhao pleads specific facts detailing Sun's unilateral actions, diversion of funds, misuse of authority, and interference with corporate governance, which together demonstrate that a pre-suit demand would have been futile under Rule 23.1 and Texas law.

96.     To the extent Texas's "closely held corporation" exception applies under Tex. Bus. Orgs. Code § 21.563, Zhao alleges that TUC functions as such a corporation, because it has a limited number of shareholders, no public market for shares, and is controlled by a small group of individuals who also serve as directors and officers. In a closely held corporation, courts may relax procedural requirements for derivative actions, including demand, contemporaneous ownership, and the requirement that recovery run only to the corporation. Zhao invokes this exception to the extent necessary to ensure that the claims are adjudicated on their merits.

97.     Security- for- expenses is unnecessary and inappropriate here, because Zhao brings these claims in good faith, seeks to protect the Company from misuse of its own assets, and pursues relief that will benefit TUC directly. Further, requiring security would be inequitable where the very party accused of waste and unauthorized expenditures (Sun) controls access to corporate funds and records. Courts routinely excuse security requirements in such circumstances to prevent the wrongdoer from insulating herself from being accountable.

98.     For all these reasons, derivative relief is proper and necessary. Without judicial intervention, TUC faces ongoing risk of corporate waste, unauthorized expenditures, and continued governance instability. Zhao therefore seeks restitution, accounting, and injunctive relief on behalf of the Company to restore proper oversight, prevent further dissipation of assets, and protect the integrity of TUC's operations pending final adjudication.

## VII.    <u>PRAYER FOR RELIEF</u>

Zhao respectfully requests judgment against Counterclaim Defendants as follows:

A.      Declaratory relief in Count I, including, but not limited to, declarations that Sun materially breached the 2024 SPAs, that Zhao's termination was effective, that Zhao shall remain as owner of 51% Class A shares and 35 Class B shares, and that Sun is not the sole owner of TUC;

B.      Judgment for breach of contract damages in Count II, including, but not limited to, allowable interest and attorneys' fees;

C.      Rescission/failure-of-consideration relief and equitable disposition of the disputed funds held in FisherBroyles LLP's trust account in Count III;

35

D.      Judgment for breach of fiduciary duty damages in Count IV, including, but not limited to, allowable interest and attorneys' fees;

E.      Orders compelling inspection, accounting, and production of TUC books and records in Count V; and

F.      Derivative relief on behalf of TUC for corporate waste/ultra vires expenditures and related equitable relief in Count VI;

G.      Costs of court, pre- and post-judgment interest as permitted by law; and

H.      Such other and further relief as the Court deems just and proper.

## VIII.   **JURY DEMAND**

Zhao demands a trial by jury on all issues so triable.

Dated: March 23, 2026                 Respectfully submitted,

                                      FISHERBROYLES, LLP

                                      */s/  Jiangang Ou*
                                      JIANGANG ("JAMES") OU
                                      Federal Bar No. 3435797
                                      Texas Bar No. 24127006
                                      Email:James.Ou@fisherbroyles.com
                                      2925 Richmond Ave., Suite 1200
                                      Houston, TX 77098
                                      Telephone: (713) 732-1637

                                      */s/ Robert B. Graziano*
                                      ROBERT B. GRAZIANO
                                      Florida Bar No. 051249
                                      Email: robert.graziano@fisherbroyles.com

36

950 North Collier Blvd., Suite 205
Marco Island, FL 34145
Telephone: (239) 877-3077
*Pro Hac Vice pending*

*/s/ Michael R. Traven*
MICHAEL R. TRAVEN (0081158)
Email: michael.traven@fisherbroyles.com
21 E. State Street, Suite 200
Columbus, Ohio  43215
Telephone: (614) 370-0614
*Pro Hac Vice pending*

*Counsel for Defendant/Counterclaim Plaintiff,*
*Chunyi Zhao*

## VERIFICATION

I, Chunyi Zhao, declare that I am the Defendant/Counterclaim Plaintiff in this action; that I have read the foregoing Counterclaims; and that the factual allegations contained therein are true and correct based upon my personal knowledge, except as to matters stated on information and belief, and as to those matters I believe them to be true. I make this unsworn declaration pursuant to 28 U.S.C. § 1746, in lieu of a notarized affidavit, because I am located outside the United States. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 22 , 2026, at Melbourne, Australia.

Signature _____

**Chunyi Zhao**

38

## CERTIFICATE OF SERVICE

I certify that on March 23, 2026, a true and correct copy of this pleading was served via CM/ECF on all counsel of record.

FISHERBROYLES, LLP

*/s/  Jiangang Ou*

39