UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

VICTORIA DIVISION

| | |
|---|---|
| Huiqun "Jenny" Lin Sun (a.k.a. Huiqun Zhang) and Texas Undercarriage Corp., | Case No. 6:25-cv-76 |
| *Plaintiffs / Counter-Defendants,* | |
| v. | **Judge David S. Morales** |
| Chunyi Zhao, | |
| *Defendant / Counter–Plaintiff.* | |

**PLAINTIFF / COUNTER-DEFENDANT SUN'S RESPONSE
IN OPPOSITION TO DEFENDANT/ COUNTER-PLAINTIFF ZHAO'S
MOTION FOR PRELIMINARY INJUNCTION**

## I.    TABLE OF CONTENTS

I.   TABLE OF CONTENTS.................................................................................. i

II.  TABLE OF AUTHORITIES ..........................................................................iv

III. INTRODUCTION ...........................................................................................1

IV.  FACTUAL BACKGROUND ...........................................................................2

   A.   The parties formed TUC together and had previously transacted its stock. ... 2

   B.   Zhao initiated the 2024 sale to satisfy Chinese regulatory requirements. ...... 3

   C.   For eighteen months, Zhao relied on the sale, never demanded payment, and never exercised shareholder rights. ................................................................. 5

i

D.   The parties' trust collapsed after Sun learned of Zhang's financial misconduct at a Chinese company. ......................................................................................... 7

E.   Zhao purported to terminate the SPAs and Sun paid Zhao in full. .................. 8

F.   Zhao was never an authorized user of TUC's bank accounts........................... 8

G.   TUC's investments in China did not constitute misappropriation. ................... 9

H.   Sun removed Zhao and Zhang from their officer and director roles at TUC.... 9

I.   Sun and TUC filed this action to put Zhao's ownership claims to bed. ........... 10

V.   LEGAL STANDARD...................................................................................................10

VI.   ARGUMENT & AUTHORITIES ..................................................................................11

A.   Zhao has no likelihood of success on the merits. ............................................ 11

i.   Title transferred upon execution of the SPAs, and Zhao's remedy for late payment is damages, not rescission of a completed transfer............................ 12

a.   Because the SPAs and Bills of Sale effected a present conveyance, payment was a covenant, not a condition precedent. ...................................... 13

b.   Zhao's purported "termination" was a legal nullity. ................................ 14

c.   Zhao ratified the transaction by accepting the purchase price, and the IOLTA characterization changes nothing....................................................... 16

d.   The Parties' course of dealing confirms their understanding of Sun's ownership. ..................................................................................................... 17

ii.   Zhao expressly waived her right to bring this suit. .................................... 17

iii.   The Bylaws do not invalidate the transfer.................................................. 18

a.   The SPA's incorporation of governing documents is not a condition precedent. ...................................................................................................... 19

b.   The stock transfer was recorded on TUC's stock transfer ledger in accordance with the Bylaws. ......................................................................... 21

c.   The certificate-surrender theory runs afoul of the Texas UCC. .............. 22

iv.   The fiduciary-duty and misappropriation allegations rest on factual premises the record refutes.............................................................................. 23

v.    Zhao's governance and books-and-records claims fall with her ownership theory. ............................................................................................... 23

B.    Zhao cannot demonstrate a substantial threat of irreparable harm. ............. 24

i.    Zhao's remedy is money damages—and Sun has already paid her. ........... 25

ii.    Zhao's claim that funds are dissipating due to misappropriation—a claim that rests entirely on Zhao's own verified petition and is supported by no other evidence—is easily disprovable. ......................................................................... 25

iii.  Governance and books-and-records harms are derivative of the ownership theory and do not independently justify relief. .................................................. 26

C.    The balance of equities favors Sun and TUC. .................................................. 26

i.    Zhao has the full value of her bargain whereas Sun and TUC face real operational injury. ............................................................................................... 27

ii.    Zhao's "status quo" framing mischaracterizes the actual status quo. ........ 27

iii.  Zhao's equitable standing is undermined by her own conduct. .................... 27

D.    The public interest favors denial. .................................................................... 28

E.    Any relief should be narrowly tailored; the proposed order is grossly overbroad. ............................................................................................................. 28

VII.  PRAYER ................................................................................................................... 29

## II.   TABLE OF AUTHORITIES

### Cases

*Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, 894 F.3d 692 (5th Cir. 2018) ................................................................................................................... 11

*BPX Operating Co. v. Strickhausen*, 629 S.W.3d 189 (Tex. 2021) ............................ 17

*Christy v. Andrus*, 722 S.W.2d 822 (Tex. App.—Eastland 1987) ............................ 16

*City of Dallas v. Delta Air Lines, Inc.*, 847 F.3d 279 (5th Cir. 2017) ........................ 11

*ConocoPhillips Co. v. Hahn*, 704 S.W.3d 515 (Tex. 2024) ......................................... 17

*Criswell v. European Crossroads Shopping Ctr., Ltd.*, 792 S.W.2d 945 (Tex. 1990)13, 20

*Fed. Savings & Loan Ins. Corp. v. Dixon*, 835 F.2d 554 (5th Cir. 1987) ................... 11

*HDS Retail N. Am., L.P. v. PMG Int'l, Ltd.*, 2012 WL 4485692 (S.D. Tex. Aug. 24, 2012) ................................................................................................................. 13

*Janvey v. Alguire*, 647 F.3d 585 (5th Cir. 2011) ................................................. 25, 27

*Johnson v. Structured Asset Servs., LLC*, 148 S.W.3d 711 (Tex. App.—Dallas 2004, no pet.) ............................................................................................................. 18

*Marathon E.G. Holding Ltd. v. CMS Enters. Co.*, 597 F.3d 311 (5th Cir. 2010)13, 20, 29

*Matter of Est. of Crawford*, 795 S.W.2d 835 (Tex. App.—Amarillo 1990)..... 14, 22, 23

*McKissock, LLC v. Martin*, 267 F. Supp. 3d 841 (W.D. Tex. 2016) .................... 27, 28

*Mobilelink San Antonio, LLC v. PNK Wireless Commc'n, Inc.*, 2016 WL 7368066 (Tex. App.—Houston [1st Dist.] Dec. 20, 2016, no pet.) (mem. op.) ..... 16

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.*, 907 S.W.2d 517 (Tex. 1995)................................................................................................................. 13

*Safeco Ins. Co. of Am. v. Clear Vision Windshield Repair, LLC*, 564 S.W.3d 913 (Tex. App.—Houston [14th Dist.] 2018) ............................................. 18

*Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471 (Tex. 2017) ................................. 18

*Sierra Club, Lone Star Chapter v. FDIC*, 992 F.2d 545 (5th Cir. 1993).................... 11

*Solar Applications Eng'g, Inc. v. T.A. Operating Corp.*, 327 S.W.3d 104 (Tex. 2010) ................................................................................................. 13, 15

*Stephens v. Three Finger Black Shale P'ship*, 580 S.W.3d 687 (Tex. App.—Eastland 2019, pet. denied) ................................................................. 21

*Texas Black Iron, Inc. v. Arawak Energy Int'l Ltd.*, 566 S.W.3d 801 (Tex. App.— Houston [14th Dist.] 2018, pet. denied).......................................... 15, 16

*Van Indep. Sch. Dist. v. McCarty*, 165 S.W.3d 351 (Tex. 2005)................................ 18

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ......................................... 11

*Yeaman v. Galveston City Co.*, 167 S.W. 710 (Tex. 1914)......................................... 14

## Statutes

TEX. BUS. & COM. CODE § 8.302(a)........................................................................ 23, 29

TEX. BUS. & COM. CODE § 8.307 ........................................................................... 23, 29

TEX. BUS. ORGS. CODE § 6.201................................................................................... 24

TEX. BUS. ORGS. CODE § 21.218.................................................................................. 2

## III.    INTRODUCTION

1.    This motion can be denied on a single legal proposition: under Texas law, when a seller executes a present conveyance of stock, her remedy for a late payment is the recovery of damages—not recission of the conveyance.

2.    On May 14, 2024, Zhao signed Stock Purchase Agreements and Bills of Sale transferring every share she owned in TUC to Sun.[1] The Bills of Sale—unilateral instruments of conveyance signed solely by Zhao—recite that Zhao "does BARGAIN, SELL and DELIVER" the shares, acknowledge receipt of consideration, and warrant and defend Sun's title "against every person whomsoever."[2] The Class A transfer was recorded on TUC's stock transfer ledger the same day. Three days later, TUC's own counsel issued a Title Opinion confirming that all shares were "currently vested in Huiqun Lin Sun."[3] Zhao raised no objection and relied on that opinion. She continued serving as a non-shareholder director for eighteen months, never once demanding payment or exercising any right exclusive to a shareholder.

3.    Only after the parties' relationship collapsed over an unrelated Chinese business dispute did Zhao—for the first time—declare the SPAs "terminated" and claim she still owned the company she had sold. Sun cured regardless, wiring the full $361,271 purchase price. Zhao retains those funds in her own counsel's IOLTA account to this day.

---

[1]    Ex. B (2024 Class A SPA); Ex. C (2024 Class B SPA).
[2]    Ex. D (2024 Class A BOS); Ex. E (2024 Class B BOS).
[3]    Ex. F (Scott Title Opinion) (May 17, 2024).

4.      Zhao's theory requires this Court to hold that a completed conveyance can be unwound eighteen months later because payment came late—even though the SPAs contain no condition precedent tying title to payment, even though the Bills of Sale use words of present transfer, and even though Zhao has been paid in full. Texas law does not permit that result. Zhao's remedy for late payment was to sue for the purchase price. She has it. The motion should be denied.

## IV.   FACTUAL BACKGROUND

### A.   The parties formed TUC together and had previously transacted its stock.

5.      The Parties and their respective spouses[4] had a significant history of shared business interests in China, including in a machinery manufacturing company in Xuzhou, which opened in 2011. For years, they operated in a spirit of trust and reciprocity.[5]

6.      On September 21, 2022, Plaintiff Sun, Defendant Zhao, and Zhao's husband, Zhang, formed TUC for the purpose of opening a manufacturing business for industrial parts in Victoria, Texas.[6]

7.      Under TUC's bylaws (the "Bylaws"), TUC is authorized to issue Class A and Class B stock shares.[7] Class A shares are voting shares with each outstanding share being entitled to one vote.[8] Holders of Class B shares have no

---

[4]     Plaintiff Sun is married to Mr. Tao "Link" Lin ("Lin"). Defendant Zhao is married to Mr. Wenbin Zhang ("Zhang"). Ex. A ¶ 2 (Sun Declaration).
[5]     *Id.* ¶ 3.
[6]     *Id.* ¶ 4.
[7]     Ex. G at Art. I.
[8]     *Id.* § 1.11.

voting powers but can request access to Company books and records.[9] TEX. BUS. & ORGS. CODE § 21.218.

8.     On November 1, 2022, Sun and Zhao executed a Stock Purchase Agreement (the "2022 Class A SPA") whereby Sun sold 310 of her Class A shares to Zhao in exchange for Zhao's promise to pay $6,851 to Sun.[10] Sun concurrently signed a bill of sale evidencing the transfer of these stocks to Zhao.[11]

**B.     Zhao initiated the 2024 sale to satisfy Chinese regulatory requirements.**

9.     In late April or early May 2024, Zhao and her husband, Zhang, informed Sun that, to comply with Chinese regulations on outbound foreign investment, they needed a U.S. legal document stating that Zhao did not own any shares in TUC. Specifically, on May 5, 2024, Zhang emailed Sun (with Zhao copied) instructing Sun to "change both A and B shares to sister-in-law's name, so there are no Chinese individuals, and no Chinese company either (because our company's capital did not come from a foreign exchange bureau)."[12] In Chinese culture, "sister-in-law" ("嫂子") is a common term of familiar respect not limited to actual relatives; Zhang used it regularly when addressing Sun.[13]

10.     It was in this context that Zhao offered to sell her TUC stock to Sun, and Sun agreed.

---

[9]     *Id.* § 1.21.2.
[10]     Ex. B.
[11]     Ex. D.
[12]     Ex. A ¶¶ 7–8 (showing Zhang's full email and providing English translation of same).
[13]     *Id.* ¶ 9.

11.     TUC's counsel, Ms. Janis L. Scott of ANDERSON SMITH NULL & STOFER, L.L.P., prepared two Stock Purchase Agreements (the "2024 SPAs") and corresponding Bills of Sale.[14] Through these instruments, Zhao transferred her entire interest—510 Class A voting shares and 35 Class B non-voting shares—to Sun, making Sun the sole owner of all Company shares.[15] The Parties agree the signatures on these documents are authentic.[16]

12.     The Bills of Sale are unilateral instruments of conveyance signed solely by Zhao as transferor. Each recites that Zhao "for and in consideration of [the purchase price] . . . the receipt of which is hereby acknowledged, has BARGAINED, SOLD and DELIVERED, and by these presents does BARGAIN, SELL and DELIVER" the shares to Sun, and each contains Zhao's representation of sole ownership and her general warranty to "WARRANT AND FOREVER DEFEND the title . . . against every person whomsoever lawfully claiming, or to claim the same or any part thereof."[17]

13.     The Class A transfer was contemporaneously recorded on TUC's stock transfer ledger the same day by Sun in her capacity as TUC's secretary.[18] The Ledger records the issuance of Certificate No. 5 reflecting Zhao's balance reduced to zero, and the issuance of Certificate No. 6 to Sun reflecting her 1,000-share

---

[14]     *Id.* ¶ 10.

[15]     Exs. B–E.

[16]     Zhao's Orig. Countercl. ¶22 (admitting Sun and Zhao signed these instruments).

[17]     Exs. C & D.

[18]     Ex. H (Stock Ledger); Ex. A ¶ 11.

position.[19] No physical Class B certificates had ever been issued, so there was no Class B ledger entry to make.[20]

### C. For eighteen months, Zhao relied on the sale, never demanded payment, and never exercised shareholder rights.

14.    After the SPAs, Sun operated TUC as controlling owner.[21] Zhao and her husband, Zhang, remained on the Board of Directors until they were removed on December 22, 2025.[22] Under the Bylaws, a director is not required to be a shareholder.[23]

15.    Three days after execution, on May 17, 2024, TUC's counsel, Janis L. Scott (who prepared both SPAs and Bills of Sale) issued a Title Opinion stating that "all of the Class A and Class B shares of Texas Undercarriage Corporation are currently vested in Huiqun Lin Sun, as of this date."[24]

16.    This Title Opinion allowed the Chinese company LaiYi (further defined *infra* at § II.D), which was operated by Zhao's husband, Zhang, to invest $4 million (USD) into TUC in November 2024.[25] This investment would not have been possible had Zhao and Zhang not complied with Chinese regulations on outbound direct investment ("ODI") by proving they were not owners in their U.S. investment target.[26]

---

19    Ex. H.
20    Ex. A ¶ 12.
21    Ex. I at Interrogatory No. 3 (Sun's Resp. to Zhao's Discovery Requests)
22    Ex. J (Shareholder Unanimous Written Consent) (Dec. 18, 2025).
23    Ex. G § 2.2.
24    Ex. F.
25    Ex. A ¶ 13 (LaiYi wired $4,000,000.00 (USD) into TUC's Wells Fargo checking account on November 1, 2024).
26    *Id.* ¶ 14.

17.    Throughout the post-sale period Zhao never once made a formal demand for payment of the SPA purchase price.[27] However, Zhao had ample opportunity to complain to Sun if she thought the payments were late. Zhao, Zhang, and their two children stayed as guests at Sun's Victoria home from June 26 to July 10, 2024, and Sun and Zhao continued their professional and personal relationship through July 2025, exchanging regular messages about business, family, travel, and other topics like raising geese.[28] Not once during any of those interactions—in person or by message—did Zhao complain about payment under the SPAs, formally or informally.[29]

18.    As Zhao admits, not once after the 2024 SPAs did she exercise any rights that are exclusive to a TUC shareholder.[30] Zhao attempts to cite examples where she was treated as a shareholder after May 14, 2024; however, her examples are fully consistent with being a non-shareholder director and do not indicate shareholder status.[31]

---

[27]    *Id.* ¶ 15; Orig. Ans. ¶¶ 19 & 23 (Zhao admitting she never made a payment demand); Ex. K at Interrogatory No. 2 (Zhao's Responses to Sun's First Set of Discovery Requests) (Zhao admits she "did not issue a separate 'formal demand' for payment prior to the November 4, 2025 demand/termination letter).

[28]    Ex. A ¶ 16.

[29]    *Id.* ¶ 17.

[30]    Ex. K at Interrogatory No. 5 (Zhao admitting "after May 14, 2024, she did not vote at any TUC shareholder meeting, execute any written shareholder consent, call or demand a special meeting, or receive any dividend or distribution from TUC").

[31]    Zhao's Mem. in Support of Mot. for Preliminary Injunction [Dkt. 20] ¶¶ 27–30 (citing how Zhao's being consulted regarding a TUC land purchase in December 2024 and signing a Unanimous Written Consent of the TUC Board of Directors in January 2025 as evidence that she remained a shareholder after the SPAs). *But see* Ex. G § 2.2 ("Directors need not be holders of stock of the corporation . . .").

**D.    The parties' trust collapsed after Sun learned of Zhang's financial misconduct at a Chinese company.**

19.    The relationship between Sun and Zhao soured in mid-2025 over a matter unrelated to TUC, involving a Chinese machinery company, Xuzhou LaiYi Precision Machinery Co., Ltd. ("LaiYi"), operated by Zhao's husband, Zhang, and in which Sun's husband, Lin, was a 50-percent silent investor.[32] To wit: Zhao's husband, Zhang, informed Sun and Lin in April 2025 that the Xuzhou Tax Bureau issued a penalty notice against LaiYi for financial misconduct including fabrication of VAT invoices.[33] For Sun and Lin, the fabricated invoices and his subsequent restriction of Sun's access to LaiYi's books constituted evidence of gross misconduct that threatened the value of the Sun's family's investment and their standing with Chinese authorities.[34] Consequently, trust collapsed over the summer of 2025, and on October 15, 2025, Zhang transferred his remaining equity in Laiyi to Zhao.[35]

20.    This background explains why Zhao, eighteen months after completing the sale and never once demanding payment, abruptly shifted course in November 2025 and declared the transfer "terminated." The delay in Sun's payments gave Zhao a veneer of legality for her attempted corporate takeover.

---

[32]    Ex. A-1 (Civil Complaint, *Tao Lin v. Xuzhou LaiYi Precision Machinery Co., Ltd.*, filed April 1, 2026, with The People's Court of Jiawang District, Xuzhou City, Jiangsu Province) (Tao Lin alleging he is a 50-percent silent investor in LaiYi); Ex. A-2 (English translation of same).

[33]    Ex. A ¶ 20.

[34]    *Id.*; Ex. A-2 (" . . . [Zhang] shut down system access that had previously been available to the [Lin]'s spouse and the [Lin]'s financial personnel.")

[35]    Ex. A-2 ("on October 15, 2025, Wenbin Zhang transferred all of his equity in the [LaiYi] to his spouse").

### E.    Zhao purported to terminate the SPAs and Sun paid Zhao in full.

21.    On November 4, 2025, Zhao, for the first time in eighteen months purported to "terminate" the SPAs for non-payment and declared herself the 100-percent owner of TUC for the first time.[36] There had been no prior demand and no notice-and-cure opportunity. Sun cured regardless: on November 17, 2025, she wired the full Class A purchase price ($11,271), and on December 15, 2025, she caused the full Class B purchase price ($350,000) to be wired to Zhao from personal, non-company accounts.[37] Zhao retains these funds in the IOLTA account of her own counsel, and has not returned the funds to Sun.[38]

### F.    Zhao was never an authorized user of TUC's bank accounts.

22.    The injunction requested by Zhao seeks to preserve the status quo by, among other things, enjoining Sun / TUC from "[c]hanging, attempting to change, or instructing any bank . . . to change authorized signatories, access rights, passwords, credentials, or control persons on any TUC account . . . in a manner that excludes Zhao."[39] However, since the inception of TUC, the "status quo" has been that Zhao is

---

[36]    Ex. L (Demand Letter) (Nov. 4, 2025)

[37]    Ex. M (wire of Class A SPA purchase price); Ex. N (wire of Class B SPA purchase price); Ex. A ¶ 21 (Sun caused these payments to be made from personal funds, not company funds); *but see* Zhao's Mem. in Support of Mot. for Preliminary Injunction [Dkt. 20] at 13 (falsely claiming Sun paid these amounts with TUC funds).

[38]    Zhao's Mem. in Support of Mot. for Preliminary Injunction [Dkt. 20] ¶ 18.

[39]    *Id.* at 19.

not an authorized user to TUC's bank accounts.[40] Only Sun and her husband, Lin, have ever been authorized users.[41]

### G.  TUC's investments in China did not constitute misappropriation.

23.  Zhao alleges that Sun, via TUC, improperly transferred approximately $500,000 to Chinese entities UM/XBIM via United Track Corporation ("UTC") to compete with Zhao, in violation of fiduciary duties.[42] It is true enough that TUC made investments via UTC (its wholly owned subsidiary) into companies that could be competitive with Zhao's own business concerns in China.[43] However, there is nothing to support Zhao's claim that these investments constituted misappropriation of funds or violated any legal duty.

### H.  Sun removed Zhao and Zhang from their officer and director roles at TUC.

24.  On December 18, 2025, Sun, as sole Class A voting shareholder, executed a Unanimous Written Consent of Shareholders removing Zhao and Zhang as directors and re-electing Sun and Lin; the reconstituted Board then executed a Unanimous Written Consent of Directors removing Zhao and Zhang from their officer positions.[44] Sun sent notice of the removals to Zhao by email on December 22, 2025, and by FedEx on December 29, 2025.[45]

---

[40]    Ex. I at Interrogatory No. 3 (Sun's Resp. to Zhao's First Set of Discovery Requests).

[41]    *Id.*

[42]    Zhao's Mem. in Support of Mot. for Preliminary Injunction [Dkt. 20] at 12.

[43]    Ex. A ¶ 22.

[44]    Ex. J (UWC of Shareholders) (Dec. 18, 2025); Ex. O (UWC of Directors) (Dec. 22, 2025); *see* Ex. G §§ 1.5, 2.7, 2.9, 4.3.

[45]    Ex. A ¶ 23.

## I.    Sun and TUC filed this action to put Zhao's ownership claims to bed.

25.    Sun and TUC initiated this action on December 21, 2025, suing Zhao for breach of contract and declaratory judgment to affirm Sun's 100-percent ownership in TUC.[46] Zhao answered and counterclaimed on March 23, 2026, seeking her own declaration and bringing a litany of other claims, including for breach of the SPAs, access to books and records, breach of fiduciary duty, and derivate claims purportedly on behalf of TUC.[47]

## V.    LEGAL STANDARD

26.    "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S. Ct. 365, 376, (2008). The movant must establish: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm; (3) that the threatened injury outweighs any harm to the non-movant; and (4) that the injunction will not disserve the public interest. *Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, 894 F.3d 692, 696 (5th Cir. 2018); *City of Dallas v. Delta Air Lines, Inc.*, 847 F.3d 279, 285 (5th Cir. 2017). Failure on any element is fatal. *Id.*

27.    At this stage the Court may rely on affidavits and otherwise inadmissible hearsay. *Fed. Savings and Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 558 (5th Cir. 1987); *Sierra Club, Lone Star Chapter v. FDIC*, 992 F.2d 545, 551 (5th Cir. 1993). A "district court abuses its discretion if it relies on clearly erroneous factual

---

[46]    Plaintiffs' Orig. Compl. [Dkt. 1].
[47]    Zhao's Orig. Ans. & Contercl. [Dkt. 18]

findings in deciding whether to grant a preliminary injunction." *Atchafalaya Basinkeeper*, 894 F.3d at 696.

## VI.    ARGUMENT & AUTHORITIES

28.    Zhao asks this Court to reverse a completed stock sale by invoking formalities she herself declined to perform and by complaining of a late payment. But her premise does not survive contact with Texas law. When a seller executes a present conveyance, acknowledges receipt of consideration on the instrument, and then complains about late payment, her remedy is to sue for the purchase price. Moreover, Zhao ratified the agreement by accepting payment and also signed contracts expressly waiving her right to bring these claims.

29.    There is no merit to Zhao's legal argument and TUC's operating to Zhao's exclusion does not threaten irreparable harm because Zhao is a stranger to the corporation. The injunction she seeks is breathtaking in scope and would harm Plaintiffs far more than the lack of an injunction would harm Zhao. Further, her theory would—if adopted—disserve the public interest by disregarding black-letter contract law and sowing doubt on the finality of stock transfers statewide.

30.    Zhao's Motion should be entirely denied.

### A.    Zhao has no likelihood of success on the merits.

31.    Zhao is asking for an extraordinary remedy—the rescission of a completed stock sale by preliminary injunction—on the theory that she, the seller, is still the owner of shares she sold, signed over, and took the purchase price for.

She cannot be. On an executed conveyance, Texas law's answer to late payment is money, not undoing of the transfer—and Zhao already has her money.

32.    Zhao's new bylaws theory, raised for the first time in her PI motion, does not rescue her: the transfer was in fact recorded on TUC's books; her own failure to deliver the certificates is what the UCC gives the buyer (not the seller) a remedy for; and the SPAs' incorporation of governing documents does not create a condition precedent to the transfer of title.

33.    Moreover, Zhao has ratified the SPAs by receiving and retaining the purchase price and also expressly waived her right to bring these claims by the terms of the BOSs.

34.    Her misappropriation allegations rest on three factual premises—personal-funds payment, pre-existing bank-account access, and surreptitious Chinese-entity transfers—that the contemporaneous record refutes. And her governance and books-and-records claims are entirely derivative of her ownership theory.

35.    For these reasons, Zhao will not prevail on the merits.

    i.    <u>Title transferred upon execution of the SPAs, and Zhao's remedy for late payment is damages, not rescission of a completed transfer.</u>

36.    Three propositions dispose of Zhao's core premise that the sale is still open to be "rescinded" eighteen months later. First, the May 14, 2024 SPAs and Bills of Sale effected a present conveyance, and the SPAs' payment obligations are covenants, not conditions precedent to title. Second, Zhao's November 4, 2025 "termination" was a legal nullity—because there was nothing left to terminate and,

alternatively, because late payment was not a material breach in the absence of a time-is-of-the-essence clause and any demand for payment. Third, Zhao ratified the transaction by accepting and retaining the $361,271 purchase price (moving the funds to counsel's IOLTA after suit was filed changes nothing). Any one of these three propositions, standing alone, defeats the Motion.

     a. *Because the SPAs and Bills of Sale effected a present conveyance, payment was a covenant, not a condition precedent.*

37. The intent of the parties, as expressed in the written instruments, controls the passage of title. *HDS Retail N. Am., L.P. v. PMG Int'l, Ltd.*, 2012 WL 4485692, at \*5 (S.D. Tex. Aug. 24, 2012) (citing *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995)). Because the SPAs contain no language conditioning transfer on receipt of payment, Sun's payment obligations are covenants—not conditions precedent. *Marathon E.G. Holding Ltd. v. CMS Enters. Co.*, 597 F.3d 311, 321 (5th Cir. 2010) ("language in a contract is not construed to create a condition precedent if another reading of that language is possible") (applying Texas law); *Solar Applications Eng'g, Inc. v. T.A. Operating Corp.*, 327 S.W.3d 104, 108 (Tex. 2010) ("A covenant, as distinguished from a condition precedent, is an agreement to act or refrain from acting in a certain way."); *Criswell v. European Crossroads Shopping Ctr., Ltd.*, 792 S.W.2d 945, 948 (Tex. 1990) (to make performance conditional, "a term such as 'if', 'provided that', 'on condition that', or some similar phrase of conditional language must normally be included"). Straightforward application of these established principles

of Texas contract law defeats Zhao's attempt to make the stock transfer conditional upon her receipt of payment.

38.     The Bills of Sale offer conclusive evidence the transfer occurred on May 14, 2024. Unlike the SPAs, which define the terms of the bargain, the Bills of Sale (executed concurrently with the SPAs) are unilateral instruments of conveyance, signed solely by Zhao, stating that Zhao "by these presents does BARGAIN, SELL and DELIVER unto [Sun]" the shares.[48] Those are words of present conveyance that reflect Zhao's own intent to immediately transfer title. This was not a mere executory promise to sell. By executing and delivering these instruments, Zhao legally divested herself of the stock—notwithstanding what she did later with any physical certificates. *Matter of Est. of Crawford*, 795 S.W.2d 835, 838 (Tex. App.—Amarillo 1990) ("[a] stock certificate is not, itself, stock in a corporation; it is a muniment of title which evinces ownership.") (citing *Yeaman v. Galveston City Co.*, 167 S.W. 710, 720 (Tex. 1914)).

>          b.     *Zhao's purported "termination" was a legal nullity.*

39.     Zhao's November 4, 2025 letter purporting to "terminate" the SPAs for "failure to make timely payment" was a legal nullity.[49] The attempt fails for two independent reasons.

40.     First, Zhao cannot "terminate" a sale that already occurred. The Bills of Sale's words of present conveyance—"does BARGAIN, SELL and DELIVER"—and the SPA's terms effectuated an immediate transfer of title on May 14, 2024. At

---

48      Exs. D & E.
49      Ex. L.

that moment, the transaction ceased to be an executory promise to sell and became an executed conveyance. Zhao cannot retroactively "cancel" a transfer of ownership eighteen months after the fact; her only recourse was to sue for the purchase price. *Solar Applications*, 327 S.W.3d at 108 ("Breach of a covenant may give rise to a cause of action for damages, but does not affect the enforceability of the remaining provisions of the contract unless the breach is a material or total breach.").

41.     Second, even if analyzed as an executory contract—which it was not—Zhao's "reasonable time" argument is relevant only if the Court first concludes that payment was a condition precedent to the transfer of title. As shown above, it plainly was not; the SPAs contain no conditional language, and the Bills of Sale effected a present conveyance.

42.     But even on Zhao's own framing, Sun's delay was not a material breach. "Time is not ordinarily of the essence, and even a date stated for performance does not mean or imply time is of the essence." *Texas Black Iron, Inc. v. Arawak Energy Int'l Ltd.*, 566 S.W.3d 801, 814 (Tex. App.—Houston [14th Dist.] 2018, pet. denied). "[L]ate performance generally is not a material breach of a contract." *Id.* (quoting *Mobilelink San Antonio, LLC v. PNK Wireless Commc'n, Inc.*, 2016 WL 7368066, at *3 (Tex. App.—Houston [1st Dist.] Dec. 20, 2016, no pet.) (mem. op.)). The SPAs contain no "time is of the essence" clause, no specified payment date, and no notice-and-cure mechanism.[50] Zhao never demanded payment

---

[50]     Exs. B & C.

during the eighteen months preceding her purported termination—itself powerful evidence the parties did not treat payment timing as material.[51]

43.     Zhao's reliance on *Christy v. Andrus*, 722 S.W.2d 822 (Tex. App.—Eastland 1987) is misplaced.[52] *Christy* is a contract-formation case, not a late-payment case. There, a fifteen-month silence after an insurance settlement offer prevented a contract from ever forming. *Christy* has nothing to say about whether a completed conveyance can be unwound for late payment eighteen months after the instruments of conveyance have done their work.

> c.     *Zhao ratified the transaction by accepting the purchase price, and the IOLTA characterization changes nothing.*

44.     Even if Zhao had had a right to terminate—which she did not—her acceptance and retention of the $361,271 ratifies the agreements and waives any alleged breach. A party ratifies a contract when, with full knowledge of the facts, she accepts benefits under that agreement. *BPX Operating Co. v. Strickhausen*, 629 S.W.3d 189, 200 (Tex. 2021) (acceptance of benefits is a "quintessential indicator of ratification"). A ratifier is bound to the "entire transaction" and "may not, in equity, ratify those parts of the transaction which are beneficial and disavow those which are detrimental." *ConocoPhillips Co. v. Hahn*, 704 S.W.3d 515, 526 (Tex. 2024).

45.     The wires hit Zhao's counsel's account and have remained within Zhao's indirect control there ever since. Only after suit was filed did counsel begin characterizing the funds as held in trust "pending Court order."[53] Placing funds

---

[51]     Ex. K at Interrogatory No. 2 (Zhao's Resp. to Sun's Discovery Requests).
[52]     Zhao's Mem. in Support of Mot. for Preliminary Injunction [Dkt. 20] at 9–10.
[53]     *Id.* at 5.

with one's own attorney is not the same as returning them; the client retains ultimate control of the IOLTA. Tellingly, Zhao cites no Texas authority for the proposition that an IOLTA placement is the legal equivalent of non-acceptance.

46.     In any event, the IOLTA point does not reach the question of stock ownership. Title had already transferred on May 14, 2024. Sun's November and December 2025 wires were tendered only because Zhao—for the first time in eighteen months—began characterizing the delay as a problem, and Sun wished both to avoid accruing interest and to come to this Court without unclean hands.

> d.     *The Parties' course of dealing confirms their understanding of Sun's ownership.*

47.     The parties' course of dealing confirms that they understood Sun was the sole owner from May 14, 2024, forward. Three days after execution, on May 17, 2024, TUC's retained counsel issued a Title Opinion stating that "all of the Class A and Class B shares of Texas Undercarriage Corporation are currently vested in Huiqun Lin Sun, as of this date."[54] Zhao and Zhang used this Title Opinion to secure approval for an outbound investment from China into the U.S. and subsequently made that outbound investment of $4 million in October of 2024.[55]

ii.     <u>Zhao expressly waived her right to bring this suit.</u>

48.     Zhao expressly waived her right to challenge Sun's stock ownership when she executed the BOSs.

49.     "The elements of waiver include (1) an existing right, benefit, or advantage held by a party; (2) the party's actual knowledge of its existence; and (3)

---

[54]     Ex. F.
[55]     Ex. A ¶ 14.

the party's actual intent to relinquish that right, or intentional conduct inconsistent with claiming that right." *Safeco Ins. Co. of Am. v. Clear Vision Windshield Repair, LLC*, 564 S.W.3d 913, 920 (Tex. App.—Houston [14th Dist. 2018) (citations omitted). "A party's express renunciation of a known right can establish waiver." *Id.* (citing *Johnson v. Structured Asset Servs., LLC*, 148 S.W.3d 711, 722 (Tex. App.— Dallas 2004, no pet.). "Waiver is 'essentially unilateral' in character and 'results as a legal consequence from some act or conduct of the party against whom it operates; no act of the party in whose favor it is made is necessary to complete it.'" *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 485 (Tex. 2017) (quoting *Van Indep. Sch. Dist. v. McCarty*, 165 S.W.3d 351, 353 (Tex. 2005)).

50.    When Zhao signed the Bills of Sale for Class A and Class B stock, she agreed to "WARRANT AND FOREVER DEFEND the title to said property unto the said HUIQUN LIN SUN . . . against every person whomsoever lawfully claiming, or to claim the same or any part thereof."[56] By its terms, that warranty runs against Zhao herself. Having warranted Sun's title against every adverse claimant, Zhao waived her right to bring this suit.

iii.    <u>The Bylaws do not invalidate the transfer.</u>

51.    Zhao's shift to a bylaws-based theory in this Motion is itself telling. Nowhere in her November 4, 2025 Demand Letter—which purported to "terminate" the SPAs for non-payment—did she contend that the May 14, 2024 transfer never happened because of missing ledger entries or unsurrendered certificates.[57] It

---

[56]    Exs. D & E.
[57]    Ex. L.

appears for the first time on March 23, 2026 in her Answer and Motion—22 months after the SPAs and 4 months after Zhao's initial demand letter.

52.     But this new theory fails on its own terms. Zhao identifies exactly two Bylaws formalities she says were not performed: (a) entry on the stock transfer books and (b) surrender of the certificate for cancellation.[58] The first was performed on the day of the sale—by Sun herself, acting in her capacity as TUC's Secretary. The second is Zhao's own statutory duty under the Texas UCC, and her attempt to invoke her own non-performance as a defense to the sale she signed is precisely backwards. And in any event, the SPAs' "subject to the Bylaws" clause is not a condition precedent to title—it is incorporation language, as Texas's presumption against conditions precedent confirms.

> a.     *The SPA's incorporation of governing documents is not a condition precedent.*

53.     The SPAs' incorporation of TUC's governing documents does not create a condition precedent that must be satisfied before title is transferred. Section 2 of both SPAs states the sale is "subject to the covenants and conditions set forth on the stock certificates and company governing documents."[59] Section 2 uses incorporation language, not conditional syntax. There is no "if," no "provided that," no "on condition that." Under Texas law, there is no condition precedent absent such terms. *Marathon*, 597 F.3d at 321; *Criswell*, 792 S.W.2d at 948.

---

[58]    Zhao's Mem. in Support of Mot. for Preliminary Injunction [Dkt. 20] at 10–11; Zhao's Orig. Counterclaim [Dkt. 18] ¶¶ 23, 41, 43 & 45–48.
[59]    Ex. B § 2; Ex. C § 2.

54.    Section 2 is also inapposite to the title question on its own terms. The governing documents contain only standard covenants (e.g., the right of first refusal at § 1.18), and the conditions on the certificates deal with regulatory compliance.[60] Read in context, "subject to the . . . company governing documents" incorporates the substantive transfer restrictions a governing document ordinarily carries—the right of first refusal (§ 1.18), compliance with the Securities Act of 1933 (§ 7.3 "Restrictions on Transfer"), and preemptive rights (§ 1.22).[61] Those are restrictions on whom a shareholder may sell to and under what external conditions. They have nothing to do with the ministerial entries that § 4.8(g) places in the Secretary's hands.[62] A buyer's acquisition of title cannot coherently depend on the buyer's own corporate-officer bookkeeping—yet that is the result Zhao's reading requires, because Sun was TUC's Secretary.[63]

55.    Zhao rests her Bylaws theory on *Stephens v. Three Finger Black Shale P'ship*, 580 S.W.3d 687 (Tex. App.—Eastland 2019, pet. denied), but this case is inapposite to her argument.[64] *Stephens* is a partnership-existence case where the court held that no partnership was ever formed. The opinion does not address rights of first refusal, consent requirements, transfer restrictions, or bookkeeping formalities affecting ownership; Zhao's pin cite to pages 694–95 is to the court's

---

[60]    Ex. G.
[61]    *Id.*
[62]    *Id.*
[63]    Ex. G §§ 1.18, 4.8(g), 7.1–7.3.
[64]    Zhao's Mem. in Support of Mot. for Preliminary Injunction [Dkt. 20] at 10–11.

procedural recitation of headnotes. *Stephens* does not stand for the propositions Zhao draws from it.

    b.  *The stock transfer was recorded on TUC's stock transfer ledger in accordance with the Bylaws.*

56. Section 7.2 of the Bylaws provides that "[t]ransfer of shares shall be made only on the stock transfer books," and its final sentence states: "[t]he person in whose name shares stand on the books of the corporation shall be deemed by the corporation to be the owner thereof for all purposes."[65] That is the Bylaws' own ownership-presumption rule.

57. The Class A stock transfer ledger reflects that on May 14, 2024, Zhao's 510 Class A shares were transferred from Zhao to Sun; Certificate No. 5 was issued reflecting the transfer; Zhao's balance was reduced to zero; and Certificate No. 6 was issued to Sun for her resulting 1,000-share position.[66] That entry was made by Sun in her capacity as TUC's Secretary, who, under Section 4.8, has "general charge of the stock transfer books of the corporation."[67] On Zhao's own cited provision, Sun is the record owner. Zhao cannot simultaneously invoke § 7.2 against the transfer and disregard the ownership rule stated in its last sentence.

58. As to the Class B shares, TUC has never issued any physical Class B certificates.[68] Section 7.1's surrender-for-cancellation clause and § 7.2's second clause are facially inapplicable to a stock class that was never certificated.[69] *See*

---

[65] Ex. G § 7.2.
[66] Ex. H.
[67] Ex. G § 4.8(g).
[68] Ex. A ¶ 12.
[69] Ex. G §§ 7.1 & 7.2.

*Crawford*, 795 S.W.2d at 838 (not "all stock ownership evinced by certificate"; "[c]omplete ownership of certificated stock may exist without the issuance of a certificate . . . or its delivery") (citations omitted).

        *c.*        *The certificate-surrender theory runs afoul of the Texas UCC.*

59.     All that remains of Zhao's Bylaws theory is her argument that she never surrendered the Class A certificate for cancellation. But a certificate is evidence of title, not title itself. *Id.* ("[a] stock certificate is not, itself, stock in a corporation; it is a muniment of title which evinces ownership of such stock") (citations omitted). A purchaser of a security acquires "all rights in the security that the transferor had or had power to transfer" immediately upon the transfer of rights. TEX. BUS. & COM. CODE § 8.302(a).

60.     The duty to supply the certificate belongs to Zhao, not Sun. Article 8 of the Uniform Commercial Code is explicit on the point, and allocates the statutory remedy for non-delivery to the purchaser—and only the purchaser:

> Unless otherwise agreed, the transferor of a security on due demand shall supply the purchaser with proof of authority to transfer or with any other requisite necessary to obtain registration of the transfer of the security, but if the transfer is not for value, a transferor need not comply unless the purchaser pays the necessary expenses. If the transferor fails within a reasonable time to comply with the demand, **the purchaser may reject or rescind** the transfer.

TEX. BUS. & COM. CODE § 8.307 (emphasis added).

61.     Zhao's theory inverts that allocation. She held the certificates; she failed to deliver them; and she now asks the Court to treat her own non-delivery as a ground for voiding the sale she signed. The UCC forecloses that maneuver. The statute's rejection-or-rescission remedy is reserved for the purchaser—here, Sun—

not for the transferor who refused to deliver. Zhao cannot convert her own unperformed duty into a defense.

    iv.    <u>The fiduciary-duty and misappropriation allegations rest on factual premises the record refutes.</u>

62.    Zhao's fiduciary-duty and misappropriation theories rest on three factual premises, each contradicted by the contemporaneous record.

63.    First, Zhao is wrong in alleging that Sun paid the SPA purchase price with TUC's money: Sun paid that money from personal funds, not company funds.[70]

64.    Second, Zhao never had access to TUC's bank accounts, so giving Zhao access (as her requested Injunction would do) creates a new arrangement instead of preserving an old one.[71]

65.    Third, Sun and TUC have not "misappropriated" any funds by investing money in China via TUC's subsidiary or by hiring legal counsel to defend against a former shareholder's ownership claims. TUC's money is TUC's to invest, and Zhao can cite no restriction on TUC investing its own money in businesses that compete with the investments of a former shareholder or her husband.

    v.    <u>Zhao's governance and books-and-records claims fall with her ownership theory.</u>

66.    The December 18, 2025, removals were valid on the face of the Bylaws and the Texas Business Organizations Code, which permit shareholder action by written consent signed by the holders of shares having the minimum votes

---

[70]    Exs. A ¶ 21, M & N. *But see* Zhao's Mem. in Support of Mot. for Preliminary Injunction [Dkt. 20] at 12 (alleging Sun paid the 2024 SPA purchase price with TUC funds).

[71]    Ex. A ¶ 5 (Sun Declaration); Ex. I at Interrogatory No. 3 (Sun's Resp. to Zhao's First Set of Discovery Requests).

necessary to take the action.[72] TEX. BUS. ORGS. CODE § 6.201 (permitting unanimous written consent in lieu of meeting). Sun, as sole Class A voting shareholder, executed the Unanimous Written Consent of Shareholders removing Zhao and Zhang as directors and re-electing Sun and Lin.[73] The reconstituted Board then executed the Unanimous Written Consent of Directors removing Zhao and Zhang as officers.[74] Because Sun is the sole voting shareholder and strictly adhered to the governance procedures, the removals are binding.

67.     Zhao's books-and-records claim fails for the same reason: shareholder inspection rights run to shareholders, and Zhao is not one. Any director-level access terminated with her December 18 removal.

68.     If Zhao needs documents for this litigation, discovery is the ordinary vehicle, and Zhao has not explained why injunctive relief is needed to supplement her discovery rights. TUC's corporate file and all bank records requested by Zhao have already been produced.

## B.     Zhao cannot demonstrate a substantial threat of irreparable harm.

69.     The Motion fails first because Zhao has no likelihood of proving she is still a shareholder; however, even if she was a shareholder, she still fails to demonstrate a substantial threat of irreparable harm.

---

[72]     Ex. G §§ 1.5, 2.7, 2.9 & 4.3 (authorizing director removal with or without cause and permitting board action by written consent and removal of officers at will).
[73]     Ex. J.
[74]     Ex. O.

i.   Zhao's remedy is money damages—and Sun has already paid her.

70.   In the Fifth Circuit, irreparable harm generally exists only "where there is no adequate remedy at law, such as monetary damages." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). On Zhao's own pleading, her claim for non-payment sounds in money: Count II pleads breach of contract for damages, and Count III pleads rescission only in the alternative.[75] The only monetary harm she identifies—the SPA purchase price—is already in her lawyer's trust account.[76] Any remaining claim is for interest on the delay between when payment became due and when it was made—a calculable sum certain. There are no dissipated or unreachable assets here because Zhao has her damages.

ii.   Zhao's claim that funds are dissipating due to misappropriation—a claim that rests entirely on Zhao's own verified petition and is supported by no other evidence—is easily disprovable.

71.   Zhao's irreparable-harm story turns on three mistaken premises: (i) that Sun paid the purchase price with TUC's money; (ii) that Zhao had TUC bank access that must now be "restored"; and (iii) that TUC's Chinese-entity transfers were unauthorized misappropriation. As already explained, each of these allegations is false.

72.   Zhao's attempt to ground irreparable harm in a purported cloud on TUC's real property or in uncertainty at TUC's banks fares no better. The status quo since May 14, 2024, has been Sun's sole ownership, confirmed by the May 17,

---

[75]   Zhao's Orig. Contercl. [Dkt. 18] at Counts II–III.
[76]   Exs. M & N; Ex. A ¶ 21.

2024 Title Opinion, which Zhao relied on.[77] Every operational harm Zhao invokes—paralyzed banking, frozen accounts, clouded real estate title, regulatory compliance conflicts—points the other way: those are the harms TUC will suffer if the injunction Zhao seeks is granted.

          iii.      <u>Governance and books-and-records harms are derivative of the ownership theory and do not independently justify relief.</u>

73.     Zhao frames loss of governance rights and books-and-records access as independently irreparable.[78] Both are entirely derivative. Her shareholder governance rights exist only if she is a shareholder, and she is not. Her director-level rights terminated on her December 18 removal.[79] Records-access concerns are addressable through ordinary Rule 26 discovery. *Janvey* confirms that where the claimed injury can be translated into money or addressed through ordinary litigation mechanisms, it is not irreparable. 647 F.3d at 600.

## C.    The balance of equities favors Sun and TUC.

74.     Zhao's Motion independently fails because the requested injunction would harm Sun and TUC far more than it would harm Zhao—a former shareholder who already received her money. *McKissock, LLC v. Martin*, 267 F. Supp. 3d 841, 859 (W.D. Tex. 2016) ("The third factor requires the plaintiff to establish that his irreparable harm is greater than the harm that the preliminary injunction will cause the defendant.").

---

[77]    Ex. F; Ex. A ¶ 15.
[78]    Zhao's Mem. in Support of Mot. for Preliminary Injunction [Dkt. 20] at 14.
[79]    Exs. J & O.

i.　　　Zhao has the full value of her bargain whereas Sun and TUC face real operational injury.

75.　　Zhao sold her shares for $361,271 and retains those funds in her counsel's bank. She is not at risk of losing anything of value she has not already received. By contrast, the injunction Zhao seeks would paralyze TUC. Her proposed order would require Court approval or Zhao's written consent for virtually every expenditure, give Zhao effective veto power over a company she sold, and freeze operations pending adjudication of a claim that fails as a matter of law. The balance on that comparison strongly favors the non-movant. *See id.* at 859.

ii.　　　Zhao's "status quo" framing mischaracterizes the actual status quo.

76.　　The status quo since May 14, 2024—when Zhao executed the Bills of Sale and acknowledged receipt of consideration on their face—has been Sun's sole ownership and operation of TUC. Sun's December 2025 governance actions were not a disruption of that status quo; they were the exercise of rights that had vested in Sun eighteen months earlier. Granting the injunction would not restore the status quo. Zhao never had bank account access; she cannot be "restored" to something she never had. Giving it to her now would create a new arrangement, not preserve an old one.

iii.　　　Zhao's equitable standing is undermined by her own conduct.

77.　　A court sitting in equity will not reward a grantor who collects the proceeds of a sale and then seeks to undo it. Zhao asks this Court for equitable relief while holding $361,271, having warranted Sun's title against every adverse claim, and having acknowledged receipt of consideration by signing the Bills of Sale.

### D.    The public interest favors denial.

78.    "[I]t is in the public interest to uphold contracts and to enforce a remedy that is provided for by Texas law." *Id.* at 860. Zhao's injunction would turn this principle on its head.

79.    Zhao asks this Court to countenance her attempt to undo a long-completed sale and seize control of a corporation almost two years after she signed unambiguous SPAs and BOSs. Such a precedent would undermine the reliability of commercial transactions in Texas by announcing that sellers may reverse completed stock sales years after execution by claiming a breach that is compensable with money damages or by invoking administrative transfer formalities they themselves declined to complete. Such a result is materially inconsistent with the *Marathon* presumption against conditions precedent and with the UCC's deliberate allocation of the certificate-delivery remedy to the buyer. *See* TEX. BUS. & COM. CODE §§ 8.302(a) ("a purchaser of a certificated or uncertificated security acquires all rights in the security that the transferor had or had power to transfer"), 8.307 ("If the transferor fails within a reasonable time to comply with the demand, the ***purchaser*** may reject or rescind the transfer.") (emphasis added).

### E.    Any relief should be narrowly tailored; the proposed order is grossly overbroad.

80.    Preliminary injunctive relief must be narrowly tailored to the harm shown. Zhao's fourteen-item proposed order is not. It seeks books-and-records access for a non-shareholder; stays of her removal; freezes on TUC transfers except in the ordinary course; prohibitions on transfers to Sun, Lin, and TUC's subsidiaries and

affiliates without Zhao's written consent; bank signatory changes giving Zhao access she never had; and effective veto power over TUC's day-to-day operations.

81.     On any view of the record, that relief would give Zhao more than she possessed prior to the disputed events, transfer operational control of TUC to a non-shareholder, and paralyze ordinary corporate activity.

82.     The Court should deny the motion in full. Alternatively, any relief should be limited to (i) preservation of records and (ii) a bond commensurate with the harm to TUC's operations during any stay, expressly rejecting the bank-access, transfer-veto, and removal-stay provisions as grossly disproportionate.

## VII.   PRAYER

83.     Zhao sold her shares. She signed the Bills of Sale. She acknowledged receipt of the purchase price on the face of those instruments. She warranted Sun's title against every claim—including her own. She then spent eighteen months participating in TUC governance as a director without once demanding payment. When Sun paid, Zhao kept the money with her own lawyer and then sued to unwind the sale. None of that entitles her to a preliminary injunction.

84.     The remedy for late payment of a completed conveyance is damages; Zhao has her damages. She has no irreparable harm, no equity position at risk, and no likelihood of success on a rescission theory foreclosed by her own instruments.

85.     Plaintiff Sun respectfully requests that the Court deny Defendant's Motion for Preliminary Injunction in its entirety.

Respectfully submitted,

**FOSTER YARBOROUGH
KILLINGSWORTH PLLC**

*s/ Patrick Yarborough*
PATRICK YARBOROUGH
Texas Bar No. 24084129
patrick@fyktriallaw.com

LUKE OTT
Texas Bar No. 24116864
luke@fyktriallaw.com

440 Louisiana Street, Suite 1800
Houston, Texas 77002
T: (713) 331-5254
F: (713) 513-5202

*Counsel for Plaintiff,*

**HUIQUN "JENNY" LIN SUN
(a.k.a. HUIQUN ZHANG)**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document was electronically served on all counsel of record in accordance with all applicable rules.

*s/ Patrick Yarborough*
PATRICK YARBOROUGH